# UNITED STATE DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

_____

| | |
|---|---|
| WOUNDED WARRIORS OF | ) |
| COLLIER COUNTY, INC | ) |
| a Florida not for profit corporation, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF NAPLES, FLORIDA, | ) |
| a Florida municipal corporation, | ) |
| | ) |
| Defendant. | ) |

_____

## FIRST COMPLAINT AND DEMAND FOR JURY TRIAL
## (DAMAGES AND INJUNCTIVE RELIEF REQUESTED)

### PRELIMINARY STATEMENT

This case presents the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-back yard ("NIMBY"). This action seeks a declaratory judgment, temporary and permanent injunctive relief, and damages for discrimination in zoning based on handicap or disability. The Defendant has engaged in a pattern and practice of conduct with the intent, purpose, and/or effect of discriminating against persons with handicaps or disabilities. This discrimination has been carried out through the use of, amongst other things, a policy of exclusionary zoning from a residential zone for housing for persons with disability, a refusal to provide a reasonable accommodation to waive that exclusion, an arbitrary interpretation of zoning laws and, even if not arbitrary, unreasonably restrictive zoning policies, and a denial of Plaintiff's Fair Housing Act claims, all of which have denied Plaintiff's ability to provide housing to persons with disabilities. Defendant's

1

conduct has threatened to deprive Plaintiff's proposed handicapped and disabled residents in need of independent housing opportunities the benefit of same. This action arises under the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §3601, et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §1213, et seq.

## I.      JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§§ Sections 1331, 1343, 42 U.S.C. § 3613, and 42 U.S.C. §12133.

2.      Venue is proper in the United States District Court for the Middle District of Florida as all acts complained of occurred within this District.

## II.     PARTIES

3.      Wounded Warriors of Collier County, Inc., ("WWOCC") is a Florida not-for-profit, tax exempt corporation with its principal place of business located in Naples, Florida. WWOCC's mission is to provide housing to formerly homeless veterans, all of whom have mental disabilities and are in recovery from substance abuse and alcoholism. WWOCC sought zoning approval and a reasonable accommodation to provide housing for up to seven (7) residents at a single-family dwelling located at 1361 5th Avenue N., Naples, Florida.

4.      The City of Naples, Florida ("City") is a Florida municipal corporation. The City is responsible for the acts of its agents and employees, including enactment and enforcement of its zoning code. The City is a public entity under the Americans with Disabilities Act, 42 U.S.C. §12131.

## III.    STATUTORY AND REGULATORY FRAMEWORK

5.      In 1988, Congress amended the Fair Housing Act, 42 U.S.C. Section 3601 et seq., to extend the guarantee of fair housing to handicapped individuals. Congress also authorized the Secretary of the United States Department of Housing and Urban Development to promulgate

2

regulations to implement the Fair Housing Act. 42 U.S.C. Section 3614a.

6.      Under the Fair Housing Act, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such an impairment, or being regarded as having such an impairment." 42 U.S.C. Section 3602(h).

7.      Under the Fair Housing Act, it is unlawful to discriminate against or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of that buyer, renter, or person residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. Section 3604(f)(1).

8.      The Fair Housing Act further provides that it is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the handicap of that person or persons residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. Section 3604(f)(2).

9.      The federal regulations implementing the Fair Housing Act specifically prohibit, as a discriminatory activity, providing municipal services differently because of handicap. 24 C.F.R. 100.70 (d)(4).

10.      The federal regulations implementing the Fair Housing Act further make it unlawful, because of handicap, "to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying, or renting a dwelling so as to . . . discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. Section 100.70(a).

11.      The American with Disabilities Act requires that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits

of the services, program, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. Section 12132.

12.     The federal regulations implementing the Americans with Disabilities Act prohibit a public entity from administering a licensing program in a manner that subjects qualified individuals with disabilities to discrimination based on disability, nor may a public entity establish requirements for the programs or activities of licensees that subject qualified individuals with disabilities to discrimination based on disability. 28 C.F.R. Section 35.130(6).

13.     The federal regulations implementing the Americans with Disabilities Act also make it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination. 28 C.F.R. Section 35.130(4)(I).

14.     To prevail on a failure-to-accommodate claim, a plaintiff must prove (1) that he is disabled, (2) that he requested a "reasonable accommodation, (3) that the requested accommodation was "necessary to afford [an] equal opportunity to use and enjoy a dwelling," and (4) that the defendant refused to make the requested accommodation. *Schaw v. Habitat for Humanity of Citrus County, Inc.*, 938 F.3d 1259, 1265-67 (11th Cir. 2019).

IV.     **STATEMENT OF FACTS**

A.     **WOUNDED WARRIORS OF COLLIER COUNTY, INC.**

15.     The mission of WWOCC is to provide safe and sober housing for homeless post-9/11 war Veterans, all of whom have either mental disabilities and/or in recovery from alcoholism and substance abuse.

16.     In pursuit of this mission, WWOCC leased the four-bedroom, two-bathroom single-family dwelling located at 1361 5th Avenue N., to provide housing and services for a maximum of

4

seven (7) Veterans plus one (1) resident manager, for a total of eight (8) residents.

17.     Prior to 2018, WWOCC identified many post-9/11 war Veterans in the greater Naples area who had served their country in the various theaters of war in Afghanistan, Iraq, Syria, and elsewhere fighting terrorism but where now were experiencing homelessness, either due to, or concurrently with, typical post-war related mental health disorders such as Post-Traumatic Stress Disorder ("PTSD"), Substance Use Disorders ("SUD"), and other co-occurring mental health issues, often a result of their battlefield experiences in service to country.

18.     Prior to 2018, there were no adequate housing options available in the greater Naples area specifically addressing the unique needs of the area's recently homeless war Veterans. In response, and in partnership with charities, foundations, other governmental agencies, such as the David Lawrence Center; the Collier County Veterans Treatment Court Program of the 20th Judicial Circuit; Catholic Charities/Diocese of Venice, Inc.; and the Collier County Sheriff's Office., WWOCC launched a small, 3-bed/3-resident pilot program in December 2018 at a separate property to provide housing and associated recovery residential services for local Veterans.

19.     The response to the pilot WWOCC house was both positive and overwhelming. Up until the underlying zoning hearing before the City of Naples, community support had been near universal.

20.     While the pilot 3-resident home proved the viability of (and unmet demand for) the Veterans housing program, the model was neither only provided a minimum therapeutic benefit but was not   financially sustainable. Nationally recognized standards for a certified Recovery Residence to be both therapeutically successful and financially stable recommend at least two (2) residents per bedroom and up to eight (8) total residents in a four (4) bedroom home.

21.     To meet this clinically recognized "critical mass" of sufficient "family" size, WWOCC

then secured the home located at 1361 5th Avenue N. and partnered with Nextep, Inc., a well-regarded and experienced southwest Florida-based provider of certified Recovery residential services,[1] to oversee the day-to-day deployment of the recovery support services and housing program.[2]

22.    Adequate and sufficient "family" size within a Recovery Residence establishes whether the home will be therapeutically viable and financially able to support itself. The Veterans themselves are unable to secure their own adequate recovery housing due to the same need to cohabitate with others. Eight (8) residents in a four-bedroom home are necessary to mitigate against the triggers of relapse, which are universally both boredom and loneliness. The high costs associated with obtaining and providing recovery residential housing alone are prohibitive, unless the requested number of residents are present.

23.    The Veterans living within the home are the functional equivalent of a family. In a certified Recovery Residence, residents experience informal and formal social structures that resemble the hierarchies typically displayed by traditional families. By naturally developing close familial-type bonds, the residents begin to care for each other in times of both physical, emotional, and spiritual need, like traditional families related by blood or marriage. Notably the U.S. Veteran's Administration's communications reference "brotherhood" and "sisterhood" to describe the relationship among veterans.[3]

---

[1] The Florida Association of Recovery Residences ("FARR") is the state-recognized certification body of all Recovery Residences in Florida, pursuant to Florida Statutes Section 397.487 et seq. https://farronline.org/ (last accessed 5/4/21).

[2] "Recovery support" services are defined by Florida law to mean, "services designed to strengthen or assist individuals to regain skills, develop the environmental supports necessary to help the individual thrive in the community, and meet life goals that promote recovery from alcohol and drug use. These services include, but are not limited to, economic, vocational, employment, educational, housing, and other ancillary services." Florida Statute Section 397.311(40).

[3] "The United States military is a brotherhood and sisterhood like no other."
https://www.blogs.va.gov/VAntage/67464/together-served-website-help-find-old-friends/??????? (last accessed 5/4/21). 2021).

24.     Like traditional families, there are regular family meetings to discuss the shared management of the house. The residents interact and socialize with each other daily, both inside and outside of the house, relearning how to establish personal bonds of trust and mutual support, like traditional families. They spend personal time together, discussing their shared efforts at overcoming and sustaining their recovery from their hardships and their shared disabilities, like the shared wisdom that traditional families provide. The emotional and mutual support and bonding experienced in a certified Recovery Residence is the equivalent of the type of love and support the City would expect of any traditional family living in the community. This is the essence of a certified Recovery Residence and why it has been clinically recognized for effectiveness in overcoming disabling mental health disorders such as Substance Use Disorder ("SUD") as well as chronic homelessness.

25.     All the Veterans who participate in the program and reside in the Recovery Residence provided by WWOCC are individuals who are disabled by virtue of their alcohol or chemical dependency and/or mental disabilities, and who are maintaining sobriety while residing in a sober living home combined with their completion of a separate substance abuse treatment program.

26.     WWOCC does not provide a substance abuse treatment program. There is no counseling, or therapy offered to the residents. Residents are required to attend meetings of 12 step groups outside of the house and/or mental health treatment and counseling.

27.     The WWOCC residence is not a substance abuse treatment center, a supportive living facility, a halfway house, a transitional home, a boarding house, or a community care facility. It is a Recovery Residence.[4] There is no treatment, counseling, therapy, or any type of health care or

---

[4] A "Recovery residence" is defined by Florida Statute Section 397.311(38) to mean a "residential dwelling unit, the community housing component of a licensed day or night treatment facility with community housing, or other form of group housing, which is offered or advertised through any means, including oral, written, electronic, or printed means, by any person or entity as a residence that provides a peer-supported, alcohol-free, and drug-free living environment."

personal care services provided at the WWOCC home.  There are no institutional personnel involved in the supervision or management of WWOCC.

28.     WWOCC only provides a peer-driven sober living environment designed to increase self-responsibility and support for persons in recovery from alcoholism and substance abuse. These services are provided by the Recovery Residence as certified by the Florida Association of Recovery Residences ("FARR") in accordance with Florida Statute § 397.487, et seq.

29.     The residents of WWOCC voluntarily choose to participate in the program and reside at the 5th Avenue N. house. Residents of the WWOCC live together as a family and make group decisions based on a collaborative basis. The WWOCC dwelling is used as single-family home with similar support and collaborative functions. The residents of the WWOCC relate to each other as the functional equivalent of a single family.

30.     The residents of WWOCC live together as a family and make group decisions based on democratic procedures. The dwelling is used as single-family home with similar support and collaborative functions as a biological family. The residents of the 5th Avenue N. home relate to each other as the functional equivalent of a single family.

31.     All residents of WWOCC have access to the entire house, all the household facilities, and function together as a single housekeeping unit. There are not any special locks on the doors of the bedrooms or other rooms in the home. The residents share all household responsibilities and live together to create a "family" atmosphere, where all aspects of domestic life are shared by all the residents.

32.     All residents are required to be alcohol and drug free as a condition of continued residency with WWOCC.

B.      THE CITY OF NAPLES ZONING CODE.

33.      The City of Naples Florida  zoning code governs zoning and land use policy in within the City.

34.      1361 5th Avenue N. is in the R1-7.5 residential zone.  The R1-7.5 district is a single-family residence district.

35.      Permitted uses in the R1-7.5 zone are single-family residences, and accessory structures which are incidental to and customarily associated with the uses permitted in this district. Conditional uses allowed in the R1-7.5 zone are recreational facilities as listed in Section 56-94 of the City's zoning Code.

36.      The City's Zoning Code in Section 44-8 defines "Family" as follows:

"Family means an individual or 2 or more persons related by blood, marriage, law, or legal adoption, or not more than 4 persons not so related living together as a single housekeeping unit in a dwelling unit. Foster children and domestic servants employed on the premises shall be considered as related by blood, marriage, law, or legal adoption."

37.      The City's Zoning Code defines "Community Residential Home" in Section 56-87(a) as follows:

"Community residential home means a dwelling unit licensed to serve clients of the state department of children and family services, which provides a living environment for seven to 14 unrelated residents who operate as the functional equivalent of a family, including such supervision and care by supportive staff as may be necessary to meet the physical, emotional, and social needs of the residents."

38.      Section 56-87(b) relating to Community Residential Homes for six or fewer residents also provides:

9

"Homes of six or fewer residents which otherwise meet the definition of a community residential home shall be deemed a single-family unit and a noncommercial, residential use for the purpose of this land development code. Homes of six or fewer residents which otherwise meet the definition of a community residential home shall be allowed in single-family or multifamily zoning districts without approval by the city, provided that such homes shall not be located within a radius of 1,000 feet of another existing such home with six or fewer residents. Such homes with six or fewer residents shall not be required to comply with the notification provisions of this section; provided, however, that the sponsoring agency or the department notifies the city manager at the time of home occupancy that the home is licensed by the department."

39.     The City does not have any classifications for housing for persons with disabilities other than "Nursing Home" which is defined in Section 44-8 as:

"Nursing, rest, or group home means a home, institution, building or residence, public or private, whether operated for profit or not, which provides accommodations, maintenance, personal care, or nursing for a period exceeding 24 hours to three or more ill, physically infirm, aged persons or others in need of physical or mental rehabilitation, who are not related by blood or marriage to the operator."

40.     A nursing home is allowed as a Permitted (as of right) use only in the M/Medical District and Planned Development/PD District

41.     The M district is a district intended to accommodate medically oriented businesses and facilities; the PD district is intended to accommodate integrated and well-designed developments in accordance with approved development plans which offer flexibility of design to encourage imaginative, functional, high-quality land planning development which is compatible with adjacent

10

and nearby lands and activities.

42.     Nursing homes are allowed as a Conditional Use in several of the City's multifamily districts.  It is a Prohibited use in all the City's single-family residential districts.

**C.     WWOCC'S REASONABLE ACCOMMODATION REQUEST.**

43.     In September of 2019, counsel for WWOCC met with the City's Planning Director and other City staff to discuss providing housing at the property for only seven (7) unrelated Veterans and one (1) house manager, for a total of eight (8) residents.

44.     The City Attorney subsequently advised WWOCC that it would have to submit itself to the City's Variance process and pay all associated filing fees in order for the request to be considered. The City does not have reasonable accommodation process in its zoning code.

45.     On or about October 1, 2019, counsel for WWOCC sent a letter to Ms. Robin Singer, Planning Director for the City, requesting a reasonable accommodation pursuant to the federal Fair Housing Act, 42 U.S.C. §3604(f)(3)(B), requesting: (i) that the City approve the use of 1361 5th Avenue N. as a "Recovery Residence" in order to provide necessary housing for more than four (4) unrelated post-9/11 war Veterans; and (ii) that the City modify the Variance process and review the application consistent with the standards established by the FHA and ADA for such requests.

46.     On or about November 14, 2019, City Attorney James Fox responded to these reasonable accommodation requests, stating: "As you are aware, the City's zoning code typically allows a maximum of four unrelated individuals to live together in such a residence. § 44-8, City of Naples Land Dev. Code. You indicate that the veterans at issue are handicapped and would benefit from living together in a supportive home environment in a residential neighborhood…. The City's variance procedure applies equally to all individuals—without regard to disability or any other protected status—who seek an exception to the City's neutral zoning requirements."

11

47.     On or about November 15, 2019, counsel for WWOCC responded to Mr. Fox's letter by stating that the City's responsive letter effectively denied WWOCC's reasonable accommodation requests and asked for reconsideration.  Notwithstanding, the City refused, and would not process any request or application that was not in the form of a Variance application and subjected to the standards of those regulations.

48.     In response, counsel for WWOCC filed with the City a combined Petition for Variance and for a reasonable accommodation on or about December 13, 2019, seeking to house seven (7) Veterans plus a house manager at the 5th Avenue N. home, and continuing to request that the City modify the Variance process and review the application consistent with the standards established by the FHA and ADA for such requests.

**D.     THE CITY COUNCIL'S DENIAL OF THE VARIANCE APPLICATION AND REASONABLE ACCOMMODATION REQUEST.**

49.     The City scheduled a hearing only on WWOCC's Petition for Variance, for February 21, 2020, before the Planning Advisory Board (PAB). The PAB is a recommending body to the City Council. The request for reasonable accommodation was not initially placed on any agenda.

50.     At the last moment, the City Attorney amended the agenda and added a separate hearing on Plaintiff's request for reasonable accommodation.

51.     After a hearing, the PAB voted to recommend denial of the variance petition.

52.     The PAB then voted to continue the hearing on the request for reasonable accommodation to March 11, 2020.

53.     At the March 11, 2020 hearing, the PAB voted to recommend to the City Council that the City approve the reasonable accommodation request, modified by the PAB for seven (7) total residents - six (6) Veterans and one house manager.

54.     Due to the Covid pandemic, the final hearing on the Variance and the reasonable accommodation was continued and rescheduled multiple times and was not finally heard until September 2, 2020.

55.     At this final September 2020 hearing, the City's Planning Director, Rebecca Singer, testified on behalf of the City and stated she supported the PAB's recommendation of denial of the Variance.

56.      In discussing the Variance criteria, she went on to state that it was the City's position that WWOCC could not meet the published criteria to use the single-family dwelling as a FARR-certifed residence for Veterans who are recovering from substance abuse issues, claiming that any hardship was self-imposed by WWOCC and the Veterans themselves. Specifically, she stated:

"There's no unique circumstances relative to this property, other than the fact that it's in a single-family zoning district. The need for this variance is created by the use that they are proposing for this particular site. So, number two is, whether special conditions or circumstances exist which are peculiar to the land or structure involved, but which are not applicable to other lands or structures in the same neighborhood or district.  There's nothing specific, there's nothing that differentiates this single-family residence from the other single-family residences in this district, neighborhood, or community.  It's likely that -- having here, the likelihood is that it was chosen because the petitioner's intent of providing normal residential environment to assist in the recovery of the residence; however, the petitioner may have chosen another location, such as in a multi-family district, which could have served the same purpose."

57.     Planning Director Singer further stated that granting the Variance would cause harm to the neighborhood: "Whether the variance will promote or will not be -- I always hate this word,

13

'inimical to the health, safety and welfare of the community.'  The code and ordinance provide for seven single family residential districts and the city has strictly enforced the single-family limitation to each of these districts to preserve the welfare of the community.  Allowing the home to house an increased number of individuals does exceed the code."

58.     Singer further testified that granting the Variance would be injurious to the neighborhood.  Her basis was that having seven (7) recovering alcoholics and a resident manager in an area designated as a "Community Redevelopment Area" would undermine the City's future redevelopment plans for the neighborhood.  "And so putting another use in here that it exceeds the number of residents doesn't seem to be consistent with the standards that we're trying to promote within a community residential redevelopment area."

59.     Singer then discussed the Planning Advisory Board's recommendation of approval on the reasonable accommodation request and stated: "I think [the recommendation] was in response to the fact that a community residential home would have allowed for that capacity, and, therefore, they felt that it was similar. There was one recommendation for a condition which had to do with parking on site, and they wanted a parking plan."

60.     Singer acknowledged that she met previously with WWOCC to discuss the home and its use as a "community residential home" under Chapter 419, Florida Statutes.  She stated: "We did bring up the community residential home as provided for in chapter 419 of Florida statutes, specifically that allows for six residents and one caretaker, and generally speaking, it's been used in the past for assisted living facility for the elderly, and that's probably how it's most commonly used. I couldn't tell you, honestly, if we have any here in the city currently housing elderly or other need types of patients because the way the statute is written that you have to consider it the same as any other single-family residence."

14

61.     She then stated that the City would not treat the 5th Avenue N. home as a "community residential home" because that happens at the state level and must be licensed.

62.     Ms. Singer then deferred to the City Attorney on the City's position on the reasonable accommodation request.

63.     The City Attorney, Mr. Fox, then testified that the City opposed the granting of the accommodation request as it would cause a fundamental alteration in the City's zoning scheme by waiving the number of unrelated persons that can reside together as a family.

64.     Mr. Vincent Keys appeared representing the River Park community where the WWOCC house is located. He stated that "It is it is the consensus of the community, of long-paying tax members of this community, that they have lived up to the ordinance [family definition] for years." He further voiced his opposition to the Variance and reasonable accommodation request by stating, "And so it is our suggestion that we live and maintain ourselves under the CDC guidelines. The members in that household are unrelated persons and social distancing could not be practiced in a small bedroom of 11 by 12, 11 by 13. And so, this unreasonable request under COVID virus affects us all.  Not only does it affect River Park, but it affects the City of Naples."

65.     In opposing the WWOCC request, another River Park resident stated: "Now, the people in River Park have already approved having it in their neighborhood, four people, they welcomed it. But then you went to five. And if you allow seven in there, then they're going to go eight, nine, you know how that happens.  So, I'm asking you right now because nobody talked about the residents earlier at all. Please consider those residents who cannot sell their property for $700….. $800,000 and move somewhere else. Consider them.  They have no place to go. You've already, city council has already pushed them to this location. At least stand up for them. These are your residents; these are your citizens."

15

66.     Another resident stated he opposed the WWOCC requests on the basis that "This is a black neighborhood, and it's been that way ever since I've been here. And that's the reason this particular project is in that neighborhood, the only reason."  The resident also added: "I don't know what neighborhood they live in, but I guarantee you what they don't have in that neighborhoods, they don't have Wounded Warriors."

67.     After the conclusion of citizen comments, the City Council members then asked questions.  Council Member Paul Perry asked the City Attorney that, if the reasonable accommodation request were granted, and there were subsequent issues in the neighborhood caused by WWOCC, could the City revoke the accommodation or were they stuck with in perpetuity? The City Attorney responded it would be assumed that all these risks were considered in granting the accommodation.

68.     Councilman Paul Perry also wanted to know what the precedential value of granting the accommodation, could another similar organization ask for a similar accommodation? Mr. Fox responded it is possible, but that each accommodation request is fact specific, but if it were similar, "it would be hard to argue against it."

69.     Council Member Michael McCabe stated: "We have a dual responsibility, and that dual responsibility is to look out for cases like this in individuals who do need and who should get reasonable accommodation, and we need to balance that against the rights of the residents.  And I think I have heard both sides of it, and I do believe that our responsibility is to make sure that we are watching out for the rights of the residents, and this case I think the rights of those at this house, this Alpha House are being upheld in that -- the model of four gives the results necessary, and that the case for necessary reasonable accommodation has not really been shown to me.  So, I, unfortunately, will be saying that I would vote 'no' on the variance, and I would have to say 'no' to the reasonable accommodation because I have not seen that the case has been proven."

70.   Council Member Raymond Christman stated that he opposed the Variance and reasonable accommodation request because he believed that the River Park neighborhood would be unfairly burdened if the requests were approved.

71.   Council Member Paul Perry stated that he believed that the reasonable accommodation request would cause a fundamental alteration to the city's zoning scheme.  He stated: "And it strikes me our zoning scheme for single-family residences is what it is and it's there for a purpose and it's served us well over the years.  That being that a single-family home is not to be used to house -- I can't go out and get ten of my friends and say, let's all live in the same house, I'm not sure I could find nine other -- well, that aside.  And because that would be disruptive to my neighbors."

72.   Council Member Paul Perry also stated: "I definitely think this, if we were to grant the reasonable accommodation request, that that is an alteration of the essential nature of our zoning code because it just tugs at the threads that are binding that community, or those two communities, and this River Park east in particular."

73.   Vice Mayor Terry Hutchinson also stated his opposition to the reasonable accommodation request. "And I can tell you now that the River Park east and River Park west community is an essential part of our community as a whole, and I don't want to do anything that would compromise – and that's what we're really talking about here is compromising certain aspects of our – or potentially compromising certain aspects of our code, vital, in my opinion, aspects of our code."

74.   Mayor Teresa Heitmann was the last speaker and stated she too opposed the reasonable accommodation request because approval of the request would impede the City's effort to turn around the CRA development in the River Park neighborhood.

75.   In rebuttal to issues raised by the City Council members, WWOCC President Dale

17

Mullin took to the podium and addressed both the therapeutic value of having more than four (4) residents in the home and the financial necessity of having up to eight (8 residents).

76.     WWOCC had earlier in the hearing presented evidence in the form of testimony and studies performed on similar sober living houses, that more than four (4) residents were needed to obtain an amelioration of the effects of alcoholism and substance abuse in a sober living home.  The facts and reasoning of why the numbers resulted in amelioration is that the increased numbers increased bonding, decreased the incidents of loneliness, and that issues could be readily discussed to alleviate any desires to drink alcohol or use drugs.

77.     Mr. Mullin gave specific reasons for why it was financially necessary to have more than four (4) residents.  He stated: "In this situation, it just becomes the scale. We are a private, you know, non-funded by any government agency, any state, local government, we haven't gotten one cent. It's all through donations from the public and fund-raising events.  So by putting eight people in there, it just reduces the cost by 50 percent. Okay? Because you don't have any more fixed cost; it's just you got some available costs as you add each individual person to."

78.     In response to a question from a City Council member, Mr. Mullin stated that initially a new resident to their program usually doesn't pay rent if that individual was homeless.  He stated: "Not initially they don't, not initially. So when they come in there homeless, most of them don't have a job, when they walk in the front door. So we've got to get them stabilized in terms of programs, we have to get them to get into treatment, get them to feel good about themselves where they can go out and get a job."

79.     After the introduction of this testimony and evidence, the City Council then voted to deny both the Variance application and reasonable accommodation request.

80.      On September 2, 2020, the City Council adopted two resolutions, one denying the

18

Petition for Variance and the other denying the request for reasonable accommodation.  The bases for the denial were: (1) enlarging the number of persons in the residence from four to eight does not contribute in a meaningful way to their recovery; and (2) the limitation of four unrelated persons is an essential aspect of the single-family zoning.

### E.     THE DEFENDANT'S DISCRIMINATORY HOUSING PRACTICES

81.     The effect of Defendant's actions has been to prevent the Plaintiff from providing housing to persons seeking to reside at the dwelling of their choice in the City of Naples

82.     Plaintiff is aggrieved person as it is a disabled person or associated with disabled persons under the Fair Housing Amendments act of 1988, 42 U.S.C. Section 3602(d) who have been injured by Defendant's discriminatory conduct and have suffered damages, economic loss, and a loss of civil rights because of the Defendant's conduct.

83.     1361 5th Avenue N. is a  dwelling within the meaning of section 802(b) of the Fair Housing Act, 42 U.S.C. Section 3602(b).

84.     The effect of Defendant's actions is to deny needed housing opportunities to persons with disabilities within the City of Naples, Florida

85.     The effect of the Defendant's conducts is to limit the housing opportunities of unrelated disabled persons by denying them the right to live together as a group in any residential zoning district within the City of Naples, Florida.

86.     The Defendant is treating the residents of the dwelling in a discriminatory fashion and are utilizing its police and zoning powers on this group of unrelated disabled Veterans living together as a common household differently than it imposes upon individuals living together who are related by blood or marriage or other groups of unrelated disabled persons.

87.     The Defendant has acted under color of state law in failing to affirmatively further fair

housing in its code enforcement activities with the purpose and effect of discriminating against Plaintiff because of their handicap or their association with provision of housing for persons with disabilities, and applying those codes so as to deny Plaintiff the residential opportunities available to persons related by blood, marriage or adoption, or other groups of similarly situated unrelated disabled persons.

88.    Plaintiff has been denied the opportunity to provide necessary housing for recovering alcoholics and persons with substance use disorders and as a result has suffered economic damages, and other irreparable harm because of Defendant's actions. They have no adequate remedy at law.

89.    Plaintiff's residents are living in fear of losing their home and are suffering anxiety, emotional distress, pain, setbacks in their efforts at recovery, and other irreparable harm because of Defendant's actions. They have no adequate remedy at law.

90.    The Defendant has utilized its police powers to threaten, intimidate, harass, and coerce the Plaintiff after they have exercised their rights under the Federal Fair Housing Act.

91.    The Defendant is intentionally and maliciously harassing, intimidating, and interfering with the Plaintiff and persons associated with the Plaintiff with the intent of preventing WWOCC from existing in a single-family neighborhood.

92.    By arbitrarily and illegally describing the proposed occupancy of the 5th Avenue N. home as an illegal use of a single-family dwelling, the Defendant is making single family housing unavailable to persons recovering from drug and alcohol addiction

V.    **CLAIMS FOR RELIEF**

**COUNT I: FAIR HOUSING ACT**

93.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 92.

94.    Defendant, the City of Naples is violating Plaintiff's rights under the Fair Housing Act,

20

42 U.S.C. Sections 3601, et. seq., and its implementing regulations by:

      a.      denying and otherwise making housing unavailable to the Plaintiff's residents because of their disability;

      b.      using its police powers as a pretext to exclude the Plaintiff and its residents because of their disability;

      c.      interfering with the right of the Plaintiff and its disabled residents to live in the dwelling of their choice;

      d.      failing to make reasonable accommodations in its zoning, and other municipal codes to afford the Plaintiff and its disabled residents an equal opportunity to use and enjoy the dwelling;

      e.      enforcing an ordinance that has the effect of denying housing to persons with disabilities;

      f.      discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the status of the WWOCC's residents as persons with disabilities;

      g.      retaliating against Plaintiff because of its exercise of their fair housing rights, and

      h      making, printing, or publishing, or causing to be made, printed, or published a statement in connection with the sale or rental of housing that indicates a limitation, preference, or discrimination on the basis of disability.

## COUNT II: AMERICANS WITH DISABILITIES ACT

95.      Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 92.

96.      The Plaintiff, Wounded Warriors of Collier County, Inc., is associated with, and/or providing housing to people with disabilities as defined in 42 U.S.C. 12102(2).

97.     The Defendant, the City of Naples is a public entity under 42 U.S.C. 12131(1).

98.     The actions of the Defendant to exclude WWOCC and its residents from single-family residential zones violates the rights of the Plaintiff under the Americans With Disabilities Act, 42 U.S.C. 12132 et. seq., and the regulations promulgated thereunder by:

a.      denying the individual residents of the Plaintiff who are persons with disabilities the opportunity to participate in or benefit from the supportive housing program offered by the Plaintiff;

b.      using municipal police powers and methods of administering those powers with the purpose of subjecting the Plaintiff to discrimination based on the disability of the WWOCC residents;

c.      subjecting the Plaintiff, based on the disability of the WWOCC residents, to discrimination;

d.      denying the individual residents of WWOCC an opportunity to participate in a program in the most integrated setting appropriate to their needs;

e.      denying the Plaintiff and residents of WWOCC - who are people with disabilities - an equal opportunity to participate in or benefit from services and programs equal to those of people without disabilities; and

f.      utilizing municipal code enforcement services that are not equal to groups of related non-disabled persons and groups of unrelated disabled persons who are not persons with disabilities.

## VI.     JURY DEMAND

99.     Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF AS TO EACH COUNT

**WHEREFORE**, Plaintiff requests that the Court:

a.       Enter a declaratory judgment that Defendant has illegally discriminated against the Plaintiff in violation of the FHA and ADA;

b.       Provide temporary and permanent injunctive relief restraining the City of Naples from discriminating and enforcing the restrictions of its definition of Family against the Plaintiff and its residents and interfering with Plaintiff with the use of the 1361 5th Avenue N. property as a home for persons with disabilities, and/or from interfering in WWOCC's residents' rights to reside in the 5th Avenue N. property;

c.       Enter a declaratory judgment stating that WWOCC's use of the 1361 5th Avenue N. property is consistent with classification of the premises as a single-family home and require the City of Naples to apply all zoning, safety, building, and land use codes to WWOCC's use of 1361 5th Avenue N. in the same manner as it does to all other single-family homes;

d.       Award the Plaintiff any available damages under the FHA and ADA;

e.       Grant an award of reasonable costs and attorney's fees; and,

f.       Order other such other relief as the Court deems just and proper.

Respectfully submitted May 6, 2021.

**BEIGHLEY, MYRICK, UDELL & LYNNE, PA**
*Co-Counsel for Plaintiff*
2385 Executive Center Drive, Suite 250
Boca Raton, FL 33130
Phone: 561-549-9036
Fax: 561-491-5509
jlynne@bmulaw.com
By: /s/ Jeffrey C. Lynne, Esq.
JEFFREY C. LYNNE
Florida Bar No. 116556

23

and

LAW OFFICE OF STEVEN G. POLIN
*Co-Counsel for Plaintiff*
*Pro Hac Vice Application Forthcoming*
STEVEN G. POLIN
3034 Tennyson Street NW
Washington, DC 20015
Email: spolin2@earthlink.net
Phone: 202-331-5848
Fax: 202-331-5849
DC Bar No. 439234

24